*Robertson & Wilder, Kinney, Ballou & McClanahan* and *F. W. Hankey* for defendants.

---

## *Ex Parte* WALTER G. SMITH.

### ORIGINAL.

SUBMITTED APRIL 23, 1902.        DECIDED JUNE 5, 19⟩².

FREAR, C.J., GALBRAITH AND PERRY, JJ.

On *habeas corpus* to test the validity of a judgment for contempt, the court may consider questions of jurisdiction only and not questions of mere irregularity or error.

All reasonable intendments are made in favor of the jurisdiction of superior courts of record when their judgments are attacked collaterally.

Whether an answer under oath by one cited for contempt operates as a purger or not depends on the circumstances.

Whether all three Judges of the First Circuit may sit together as a court or not is immaterial if, when they do sit together, the presiding judge for the term substantially conducts the proceedings and finally pronounces judgment as if he alone constituted the court, the others being deemed to act in an advisory capacity only.

The facts and much of the law are set forth in Mr. Justice Perry's dissenting opinion. The case is one of great difficulty.

There is no doubt that the publication in question would be held a contempt at common law,—whether it should be regarded as relating to a pending case or to a terminated case, or to the judge generally without reference to any particular case, or whether it was in the presence of the court or not. There is also no doubt that it should be held a contempt under our statutes, if the decision in the *Bush* case, 8 Haw. 221, should be followed, for, according to that decision, the legislature in providing, by the Act of 1898 (P. L. § 262), that constructive contempts should no longer be punishable as such, regarded as constructive contempts only those that were not enumerated in the previous statute (P. L. § 257) and did not mean to include all those that are generally regarded as constructive contempts, and the publication in question clearly comes within at least one of the classes enumerated in the previous statute.

If, therefore, this should be regarded as a case of constructive contempt under the general law, the main question for consideration would be whether the decision in the *Bush* case should be followed or reversed. Assuming that that decision was sound when it was rendered, there might still be a question whether the publication, if it could be considered as relating only to the terminated case or to the judge generally, and not to the pending case, could be regarded as a contempt punishable summarily, now that we have come under the provisions of the federal constitution relating to freedom of speech and of the press, which, although not differing materially from the corresponding constitutional provisions in force here when the *Bush* case was decided, might perhaps be construed differently to some extent. See *State v. Circuit Court*, 97 Wis. 1.

But must we regard this as a case of constructive contempt under the general law? It may have been such in fact. We may have found it such if we had passed upon the question in the first instance, or we might find it such if the case were here

on appeal, or perhaps even on writ of error. But must we regard it as such in these *habeas corpus* proceedings? The Circuit Court is a Court of general and superior jurisdiction. Contempt cases are not appealable or subject to review by writ of error under our statutes. *Habeas corpus* is a collateral proceeding. In a collateral proceeding mere irregularities and errors cannot be inquired into as on appeal or error; only questions of jurisdiction can be inquired into, and every presumption is indulged in support of the jurisdiction of a superior court. On appeal or error, judgments of superior courts, at least if the jurisdiction is limited, may be set aside, if jurisdiction does not appear on the face of the record, but on *habeas corpus* they may be set aside only when jurisdiction affirmatively appears to be wanting.

In *Cuddy, Petitioner*, 131 U. S. 280, the petitioner sought release on *habeas corpus* from a judgment of contempt. The act constituting the contempt was set forth in the judgment, but it did not appear whether the act was committed in the presence of the court or not and so whether it was covered by the statute or not. Counsel contended that the act was not committed in the court building or while the court was in session, and that the case was therefore distinguishable from another case that was argued and decided at the same time, in which it was held that an act committed in a room near the court room and while the court was in session was "in the presence" of the court. It appeared that the act consisted of an attempt to influence one who had been impanelled as a juror for the term but before he was called for the particular case. Apparently it was in fact (as appeared by the record of the lower court, *In re Cuddy*, 40 Fed. R. 62, but not by the record in the Supreme Court) committed a quarter of a mile from the court house and when the court was not in session. The court said in substance that neither the petition for the writ nor the part of the record of the lower court that was produced showed the particular locality where the act was committed, and that upon a collateral attack by *habeas corpus* every intendment was made in support of the

jurisdiction of superior courts, and remanded the petitioner to custody.

The present case is before us in a very unsatisfactory state. The mittimus seems to refer to two convictions, both, however, apparently intended to cover the same or nearly the same ground, the one referring for the facts to the affidavit on which the citation was issued, the other purporting to set forth the facts and, among other things, stating that the published matter was false, malicious, etc. and had special reference to the case on trial and to the judge presiding therein, and was circulated and published in the court room during the trial of the case, that it was calculated to and did prejudice the minds of the jury and prevent a fair and impartial trial and was calculated to and did obstruct the court in the administration of justice, and in its duties in the trial of the case then pending and undetermined. What purports to be a transcript of the stenographer's notes of the proceedings shows only one conviction, which refers to the affidavit for the facts. It contains also an oral opinion delivered by another judge who was with the trial judge on the bench; also the testimony of certain witnesses, which shows that the jurors in the pending case saw the alleged contemptuous publication in the hall and room adjoining the court room, if not in the court room itself, but does not show what the petitioner had to do with its circulation in or near the court room as distinguished from the city at large, nor does it show whether the court was in session at the time. Whether the presiding judge himself saw the paper circulated in the court room during the trial does not appear except by the recital in the mittimus. The transcript does not indicate that it contains all the evidence, though there is nothing to show that it does not, nor is the usual stenographer's certificate attached to it though it is signed by the stenographer, nor was it made a part of the record in this court nor does it purport to have been filed or to be a part of the record in any court. We would be justified, however, in overlooking these irregularities as counsel on both sides have taken it for granted that the transcript was complete and a part of the record. The affidavit sets forth in substance that the petitioner

made and published for circulation the matter in question, intending thereby to throw disrespect upon the judge and to present the former action in a ludicrous, etc. manner, and to prejudice the case in the minds of the public and jury trying the cause, and that by reason of said published matter and intending to publish animadversions on the evidence or proceedings in a pending trial tending to prejudice the public respecting the same and to prevent and obstruct the administration of justice, and by knowingly publishing an unfair report of the proceedings of the court and malicious invectives against the court and jury tending to bring the administration of justice into contempt, etc., did commit a contempt of court. No allegation was made in the petition, nor was any offer made in this court to show just where or under what circumstances the publication and circulation took place, nor was any attempt made to show these things in the lower court by the testimony of the witnesses for the petitioner or on cross examination of witnesses against him or in any other manner than by the petitioner's answer, under oath, denying knowledge of the pendency of the second case and alleging that the publication related to the first case only.

The contention that the petitioner thereby purged himself of the contempt cannot avail in this collateral proceeding, considering that the lower court found against him and considering all the circumstances under which that finding was made, assuming that in our opinion the finding was erroneous. We must in these proceedings regard the publication as relating to the pending case.

Thus, it is not clear whether the court found that the publication or circulation took place in the court room or not, and it would seem to be immaterial whether it was in the court room or in the adjoining hall or room, if the other necessary conditions were present. It is not clear whether the court was in session or not. Perhaps that also would be immaterial, if it was during a recess merely or temporary adjournment from one day to the next, and if the other essential features were present. It is not clear whether the petitioner had anything to do with the

publication or circulation in or near the court room or not. This is very material, unless the petitioner should be regarded as responsible in law for the publication and circulation there as a natural and probable consequence of the publication and circulation of a paper of such general circulation in the city where the trial was pending. Whether he should be thus held responsible is a nice question, the affirmative being held by very respectable authority, and no argument or authority having been presented on behalf of the petitioner in support of the negative. Whether the decision in the *Bush* case which, if followed, requires us to remand the petitioner to custody, in any view that can properly be taken of the case on the evidence, should be reversed, is also, to say the least, a nice question,—upon which no argument has been presented on behalf of the petitioner, although that decision is most strenuously urged *contra*.

If, as is the case in some other jurisdictions, contempt cases were appealable under our statutes, and this case were before us on appeal, or, if the statute required the court in adjudging a contempt to explicitly set forth all intermediate necessary findings upon which the final judgment is based, the result might perhaps be different. But in the absence of such findings or of an affirmative showing of want of jurisdiction either by the record or by matter outside of the record, the judgment cannot be set aside in a collateral proceeding.

The fact that all three Judges of the Circuit Court sat at the hearing of the contempt case does not make the proceedings void. Whether they might properly all sit as a court, it is unnecessary to say. For, although during the earlier stages of the hearing they seem to have regarded themselves together as constituting the court, yet the part that the judges other than the presiding judge took was unimportant and was joined in by the presiding judge, and before the end of the case the view was apparently taken that the two former were there in an advisory capacity only, and the presiding judge alone finally pronounced judgment in form as if he alone constituted the court.

The case as a whole presents many fertile themes for comment, but it is unnecessary to discuss them.

The petitioner is remanded to the custody of the High Sheriff.

*Smith & Lewis* and *Andrews, Peters & Andrade*, for the petitioner.

*Geo A. Davis, contra.*

### CONCURRING OPINION OF GALBRAITH, J.

The petitioner was charged and found guilty of contempt of the Circuit Court of the First Circuit of this Territory. This court cannot in *habeas corpus* examine and determine whether or not the facts were sufficient in our opinion to constitute the offense or the sentence unduly severe, as might be done on appeal or writ of error if such process were available. The only question presented in this proceeding is one of jurisdiction or power of the court to impose the sentence complained of, the court's jurisdiction over the subject matter and the person of the petitioner being admitted. *Ex parte Fugihara Oriemon*, 13 Haw. 102, 106, 107.

It is argued with great industry in the brief of the petitioner that the legislative had the power to define what shall constitute contempt of court and prescribe the punishment in all legislative courts and that the Circuit Court of the First Circuit is such a court. This position may be admitted. The legislature has acted on the subject and I may concede, rightfully.

Section 257, Penal Laws, reads as follows:

"Contempt of Court.

"Sec. 257. Whoever, after trial by jury, is adjudged guilty of contempt of any judicial court, whether by open resistance to the process or proceedings thereof, or of any Judge or Justice thereof in the lawful exercise of his judicial functions; or by insulting, contemptuous, contumelious, disrespectful or disorderly language, behavior or act, or breach of the peace, noise or other disturbance in the presence or hearing thereof when in session; or by willful disobedience or neglect of any lawful process or order; or by refusing to be sworn as a witness, or when sworn, to answer any legal and proper interrogatories; or by publishing animadversions on the evidence or proceedings in

a pending trial tending to prejudice the public respecting the same, and to obstruct and prevent the administration of justice; or by knowingly publishing an unfair report of the proceedings of a Court, or malicious invectives against a Court or jury tending to bring such Court or jury, or the administration of justice into ridicule, contempt, discredit or odium, shall be punished by imprisonment at hard labor not exceeding two years, or by fine not exceeding five hundred dollars; provided, however, that every judicial tribunal, acting as such, and every Magistrate acting by authority of law in a judicial capacity, may summarily punish persons guilty of contempt, as follows:

"1.    The Supreme Court, by imprisonment not more than three months, or by fine not exceeding one hundred dollars, or by both such fine and imprisonment, in the discretion of the Court.

"2.    Any Circuit Court, or any Court of Probate, by imprisonment not more than two months, or by fine not exceeding one hundred dollars.

"3.    Any Circuit Judge or Police Justice, by imprisonment not more than thirty days, or by fine not exceeding fifty dollars.

"4.    Any District Justice, Coroner, or other person acting in a judicial capacity by authority from any Court of Record, by imprisonment not more than ten days, or by fine not exceeding ten dollars."

The Circuit Courts of this Territory are authorized by this statute to punish summarily persons adjudged guilty of contempt of court. It will be observed that some of the acts set out in the statute would be under the common law direct contempt and that others would be indirect or constructive contempt, but the legislature in enacting the statute did not classify the offense according to the common law or otherwise, and I dispute the authority of this court to make a classification that the legislature did not make or authorize.

It is not profitable to discuss the mittimus or its contents, since there is a judgment in the record before the court. The petitioner was charged in the motion and affidavit with contempt of court in the language of the statute (Sec. 257) and the judgment runs, "It is therefore the judgment of this court that you be and you are hereby adjudged guilty of contempt of court

*as set forth in the affidavit.*" "This language fits exactly the words of the statute." (*In re Bush,* 8 Haw. 223.)

But it is contended that under the definition given in the Law Dictionary and in the decisions of some courts, the acts charged in the affidavit would not constitute direct contempt but would be indirect or constructive contempt and that the legislature has taken away the power of the court to punish summarily for constructive contempt and therefore the judgment was void. This argument is based principally on the construction of the Act of August 20, 1888. This Act contains three sections (Session Laws 1888, p. 98). It is entitled "An Act *to define* and *limit* the authority of courts and judges to punish for contempt *in certain cases.*"

"Sec. 1. The publication of proceedings before any court or judge shall not be deemed to be contempt, nor shall such publication be punishable as contempt.

"Sec. 2. Constructive contempts shall not hereafter be punishable as such.

"Sec. 3. The terms of this Act shall apply to the publication of all proceedings in all courts, or before all judges, hitherto had, now pending or which may hereafter be brought."

There is no repealing clause with the Act and no reference is made therein that would indicate any intention on the part of the legislature to repeal any existing statute. Sec. 257, P. L., was in force at that time. The title of the Act shows that the intention of the legislature was not to repeal some existing statute but to "define" and "limit the authority." The definition was given in the first section, i. e., publication of proceedings and the limitation in the second section, constructive contempt. The publication of proceedings before the court had been held to be contempt although not made so by Sec. 257. It was this construction that the legislature intended to restrain and this power limit. It is generally supposed that this Act resulted from certain decisions of this court rendered a short time previous. In *Ackerman v. Congdon,* 7 Haw. 31, the publication of pretended facts in relation to a civil case pending in this court, was held not to be within any of the provisions of Sec. 257, but

that aside from the statute it was a constructive contempt and punishable by the court. In *Smith v. Aholo*, 7 Haw. 115, it was held that the publication of the contents of a bill in equity filed in court was constructive contempt under the rule announced in the *Ackerman* case and punishable as such. I think that the constructive contempt in the legislative mind was that as defined in the *Ackerman* and *Smith* cases expressly held by the court not to be within the provisions of Sec. 257.

This construction is supported by the decision of this court rendered at the February term, 1891, wherein the same contention was made by the petitioner as is made in this case. The court said, "Were we to proceed alone upon the common law, the contention of counsel would seem to be sustained by authority. But we have a statute which, so far as we have learned, is peculiar to this country, and which describes and enumerates certain acts and circumstances as contempts and makes them punishable upon indictment and conviction by a jury and also summarily. These acts are not classified in the statute as direct and constructive contempts. Some of these acts would fall under one head and some under another, as generally classified. By our penal law, however, they are all contempts and punishable either summarily or upon indictment, or in both ways."

"The legislature in enactly the law of 1888 had in mind, without doubt, the then recent cases decided by this court in which certain publications, avowedly not of the character enumerated in the Penal Code as contempts, were construed by the court to be contempt and these the legislature declared to be no longer punishable as such." *In re Bush*, 8 Haw. 222, 223.

This decision interpreting and defining the intention of the legislature in passing the Act of 1888, was rendered when the court was composed of the late Chief Justice Judd, Justices McCully, Bickerton and Dole. Each member of the court at that time was closely identified with the interests of the islands and thoroughly familiar with their history. They were certainly in a better position to know the intention of the legislature in enacting the law of 1888, than any one of the present mem-

bers of the court. It seems to me that the decision in the Bush
case is controlling in this. I concur in the judgment of the
Chief Justice remanding the petitioner.

### DISSENTING OPINION OF PERRY, J.

The petitioner was sentenced to imprisonment for the term of
thirty days for an alleged contempt of the Circuit Court of the
First Circuit and then brought this petition for a writ of *habcas
corpus* to determine the legality of such sentence and commit-
ment. Many questions are presented.

One McCarthy was tried in the Circuit Court upon a charge
of mayhem. The jury rendered a verdict of guilty. There-
after, upon motion of counsel, the court discharged the defend-
ant on the ground that there is no such crime known to our law
as mayhem. This was on March 5, 1902. On March 11, Mc-
Carthy was arraigned before the same court on a charge of as-
sault and battery based on the same acts, and the trial was begun.
In its issue of the day following, and while the trial was still
pending and the case undetermined, the Pacific Commercial
Advertiser, a newspaper printed and published in this city, of
which newspaper the present petitioner was then the editor, con-
tained a certain cartoon and certain printed words said to be of
and concerning the Hon. George D. Gear who was the judge
presiding at the two trials referred to. One of the attorneys
for the defendant on the day last named presented to the court
a motion or affidavit praying that the editor of the Advertiser be
cited to appear and show cause why he should not be summarily
punished for contempt of court, charging in the affidavit that the
editor "did make and publish for circulation an insulting, con-
temptuous, contumelious, disrespectful cartoon or picture a copy
of which is hereto attached and made a part hereof, intending
and meaning thereby to throw disrespect upon the Honorable
George D. Gear, one of the judges of said court, and the pre-
siding judge at both of the trials hereinbefore named; and in
said cartoon or picture intending to and attempting to represent

the former action in a ludicrous and disgraceful manner of him the said Honorable George D. Gear in his official and judicial capacity, as well as to prejudice the case of said defendant in the minds of the public and jury trying said cause and that by reason of said insulting, contemptuous, contumelious and disrespectful picture or cartoon, and intending to publish animadversions on the evidence or proceedings in a pending trial tending to prejudice the public respecting the same, and to obstruct and prevent the administration of justice; and by knowingly publishing an unfair report of the proceedings of the Court, and malicious invectives against the court and jury tending to bring such court and jury, and the administration of justice into ridicule, contempt, discredit and odium, did then and there and thereby commit a contempt of court." An order was thereupon issued citing Smith to appear at a time stated and show cause why he should not be adjudged guilty of contempt "in publishing, printing and circulating the said statement of and concerning the Presiding Judge of this Court and the cartoon or picture with reference to a cause now pending and undetermined in this Court, to wit: the case of the Territory of Hawaii against William McCarthy, and which said statement and publication and picture or cartoon is well calculated to prejudice and will prejudice the minds of the jury sworn to try the issues and hinder, obstruct and prevent the court and jury in the discharge of their duties and the Administration of Public Justice." The respondent appeared and filed a return and after certain other proceedings had been had, judgment was rendered and sentence pronounced.

In the view which I take of the case, it becomes material to consider whether the respondent in that proceeding was committed and sentenced for a constructive contempt or for a direct contempt.

As to the distinction between these two classes of contempts. "A direct contempt, or a contempt *in facie curiae*, is noisy or tumultuous conduct in the presence of the court, or so near thereto as to interrupt its proceedings; or an open defiance of

its powers or authority; or disrespectful behavior or language to the presiding judge; or any improper conduct tending to defeat or impair the administration of justice. An indirect or constructive contempt is one offered elsewhere than in the presence of the court, and which tends by its operation to degrade or make impotent the authority of the court, or in some manner to impede or embarrass the due administration of justice."—7 Am. & Eng. Encycl. Law, 2nd ed., 27. "Contempts are defined to be, direct, such as are offered in the presence of the court, while sitting judicially, or constructive, such, though not in its presence, as tend to obstruct and embarrass or prevent the due administration of justice."—*State v. Wilson*, 64 Ill. 195. "The contempt is direct when committed before and in the presence of or so near to the court as to interrupt the proceedings of the court. * * * Contempts are constructive when they are committed not in the presence of the court, and when they tend by their operation to interrupt, obstruct, embarrass or prevent the due administration of justice."—*Whittem v. State*, 36 Ind. 196, 212, 213. "Contempts are generally divided by jurists into the classes of direct and constructive; direct being those committed in the presence of the court, and constructive being those acts which the court would have to construe by some process of reasoning to be equivalent to a direct contempt."—*In re Bush*, 8 Haw. 222. See also Church on *Habeas Corpus*, §306; *Bradley v. State*, 50 L. R. A. 692 (111 Ga. 168); *Cooper v. People*, 22 Pac. (Colo.) 795; *State v. Kaiser*, 20 Or. 57.

Assuming that the cartoon and words complained of are of the nature charged in the affidavit, i. e., insulting, contemptuous, contumelious, disrespectful and tending to obstruct and prevent the administration of justice, and that, as contended on behalf of the present respondent, they were of and concerning the case then pending and undetermined and not, as contended on behalf of the petitioner, of and concerning the case first tried and then concluded, and that the Circuit Court so found, and that such finding cannot be reviewed on *habeas corpus*, still, if the objectionable matter was published and circulated or caused

17–D

to be published and circulated by Smith, or even, perhaps, by the proprietors of the Advertiser, only in the city generally and not in the court room or in the adjoining portions of the court house, these acts would at most constitute a constructive contempt only. If, on the other hand, Smith or, let us say, the proprietors, published and circulated such matter, or caused it to be published and circulated, within the court room or in the adjoining portions of the court house, the contempt would be direct. Although there may be, perhaps, a few authorities to the contrary, this is supported by the great weight of authority. In *Cooper v. People, supra,* immediately after the language above quoted, the court said: "The acts here complained of belong to the latter class" (constructive), "if either. They consist of the publication in a newspaper, of general circulation in the place where the court was being held, of such articles in reference to a case pending as were calculated to interfere with the due administration of justice, as it is said." "We have in this case, not a case of direct contempt, but a case of indirect or constructive contempt alleged to have been committed by the publication of these several articles in a daily newspaper, which are alleged * * * were intended to and did prejudice the people against the court and grand jury, embarrass the administration of justice and reflect upon the court and its proceedings."— *Fishback v. State,* 131 Ind. 304, 312. "A newspaper corporation which deliberately seeks to influence judicial action by the publication of articles threatening the judges with public odium and reprobation in case they decide a pending cause in a particular way, is guilty of constructive contempt."—*State v. Bee Publishing Co.,* 50 L. R. A. (Neb.) 195.

*Ackermann v. Congdon,* 7 Haw. 31 (January, 1887) ,was a case of a publication in a newspaper of an article containing expressions which were deemed by the court to be "calculated to prejudice the tribunal which was to try defendant's case and render it unfavorable to him." The defendant's case referred to was pending. The publication was held to be a contempt, but that it was regarded as a constructive contempt is plain from

the language of the court: "As the case before us is the first
instance of constructive contempt of this character brought to
our notice, and as the case is not a serious one, we impose no
fine." (p. 38.)

In *Smith v. Aholo*, 7 Haw. 117 (April, 1887), the publication
in a newspaper, was of an abstract of a bill in equity and while
the suit was pending. The court said: "We had occasion, at the
January term, 1887, of this court, in the case of the Hawaiian
Gazette, *ante*, page 31, to say that such publications as appear
to have a prejudicial effect upon the rights of the parties in
cases pending in the courts, were punishable as constructive
contempts of court.   *   *   *   The publication in question
comes within the principle laid down in the *Gazette* case, and is
fully sustained by authority." See also, on this subject, *State
v. Circuit Court*, 72 N. W. (Wis.) 193, 195.

The case of *Telegram Newspaper Co. v. Commonwealth*, 172
Mass. 294, cited for the respondent, does not hold to the con-
trary. It was immaterial in that case whether the contempt
was direct or constructive, for the court was not limited by
statute in the matter but had power to punish either or both.
The court merely held that the publication was *a* contempt, and
while it said, p. 298, "If the publication amounts to a contempt
of court, because it interferes with the due administration of
justice in a cause before the court, the contempt is *analogous*
to a contempt committed in the presence of the court," it also
said, "The contempt, if there was one, *was not, strictly speak-
ing, committed in the presence of the court*, but it related to a
trial then before the court." (Italics mine.)

The mere fact that the petitioner, at the time that he pub-
lished or caused to be published and circulated, generally, the
newspaper containing the matter in question, knew, if he did,
or must have known, that some subscriber or subscribers, to
whom the paper would be delivered in due course, might bring
copies of the paper to the court room and there circulate or pub-
lish them, would not of itself, on any principle that I know of,
render the petitioner criminally liable for such publication or

circulation in the court room. (There is, it is true, authority to the contrary.) To convict him upon such facts would be to hold him liable for the acts of others not aided, incited or encouraged by him. Such a case would not come within the rule as to responsibility for the natural and plainly probable consequences of one's acts.

Bearing in mind these definitions and distinctions, of what offense does the mittimus show the petitioner to have been adjudged guilty and for what offense does it show that sentence was imposed upon him?

After reciting in full the motion for citation or affidavit the mittimus further recites that Smith was cited to answer "to the *said charge* of contempt which had been duly filed against him" and that upon due hearing of the evidence and of counsel "in support of the charge" and *contra* "the said Circuit Court found the said Walter G. Smith guilty of *a contempt* of this court *as charged in the affidavit and motion.*" The affidavit and motion, as appears from the quotation above made, charged a constructive contempt only; it charged that the petitioner "did make and publish for circulation" the matter referred to and, perhaps, that he knowingly published an unfair report of the proceedings and malicious invectives, etc. It did not, directly or indirectly, charge a publication or circulation by the petitioner or by any one else in the court room or in the court house. Thus far, then, the mittimus shows a conviction of a constructive contempt only.

The Cuddy case (131 U. S. 280) is distinguishable from that at bar. In the former the finding of the lower court was that the petitioner "did approach" a certain juror with a view to influencing him. The record in the *habeas corpus* proceedings was entirely silent as to the place where the juror was approached. The words used in the finding were consistent with the theory that the act was committed in the presence of the court as well as with the theory that it was not committed in the presence of the court. The Supreme Court held that under those circumstances the presumption was that the court found that

the juror was approached in the presence of the court and that therefore the sentence was valid. In the case at bar, on the other hand, the record shows affirmatively, as it seems to me, that the acts charged were committed elsewhere than in the court room or court house. The language of the affidavit, adopted and made a part of the judgment and mittimus, is to be read in its ordinary acceptation. So read, it means, if it means anything, that the making and publishing was away from the court house. When one says that the "Advertiser" is "a newspaper printed, published and of general circulation within Honolulu" and that in its issue of a certain day the said newspaper and its editor and servants, "did make and publish *for circulation*" certain matter, he certainly does not mean that it was in the court room or court house that the editor and others did so make and publish *for circulation*. The language used seems to me to be incapable of such a construction.

The next and last recital of the mittimus in the case at bar is as follows: "And whereas the said Walter G. Smith was guilty of a contempt of this Court by publishing and printing a certain false, scandalous, malicious and defamatory statement accompanied by a printed picture or cartoon, which said statement and cartoon had especial reference to the case of the *Territory of Hawaii v. William McCarthy* and to the conduct and judicial acts of the judge presiding on the trial of said cause, which said false, scandalous, malicious and defamatory statement and printed picture or cartoon was circulated and published in the Court room, in the Court house in Honolulu during the trial of the cause of the *Territory of Hawaii v. William McCarthy*, which said publication was calculated to prejudice and did prejudice the minds of the jury and prevent a fair and impartial trial of the issues involved in said case, and is calculated to obstruct and did obstruct the Circuit Court in the administration of justice and in its duties in the trial of said cause which was then and is now pending and undetermined." Of this it is to be observed that it is not a recital of a conviction or of an adjudication of guilt, but merely that Smith *was* guilty.

The mittimus, however, is not the judgment or verdict; it is merely a formal order issued to the Sheriff reciting that a certain judgment or verdict has been theretofore rendered and sentence passed and directing the execution of such sentence. It is not sufficient that the mittimus recite that the accused *was* guilty but it must show on its face that he has been *adjudged* guilty by a jury or by the court, as the case may be. In other words even though an accused is guilty, a conviction or judgment to that effect by a competent tribunal is necessary to support a sentence or the execution thereof. Without such conviction or judgment, the sentence and order of execution would be invalid. "But it is clear that a general order to imprison a party unless he has been convicted either by a jury or by the court is a mere nullity. The law requires that before a sentence of imprisonment shall be passed against a party, he should first be convicted of an offense. In ordinary cases, this conviction must be by the verdict of a jury. In the case of contempts, it may be by the judgment of the court. Still, in either case, the record must show a conviction. Now it will be seen from this return that there is no judgment of imprisonment for a contempt generally, or for a contempt in refusing to answer questions. There is not any conviction or adjudication by the court that Mr. Adams had been guilty of a contempt. Without such judgment the court had no right to commit him to prison, nor the sheriff to detain him. It is true, and was admitted on the argument, that Mr. Adams did refuse to answer questions asked by the grand jury, and it may be true that the court considered that a contempt for which he deserved imprisonment, but no such judgment has been rendered in the case; and however many contempts the prisoner may have committed, it is not lawful to imprison him until convicted thereof by the judgment of the court, which judgment and conviction must appear by the record."—*Ex parte Adams*, 25 Miss. 892 (59 Am. Dec. 234, 242, 243). "So that it appears that there has been *no adjudication* that petitioner and his associates have been guilty of a contempt. If this be true, then the commitment, occupying as it does the place

of *an execution*, has no basis on which to rest. For it is the *judgment* and not the *mittimus*, by virtue of which the party committed is detained. *People ex rel. v. Baker*, 89 N. Y. 460. Unless the *record* shows a judgment of conviction of contempt, a petitioner may avail himself of the remedy provided by *habeas corpus.*"—*Ex parte O'Brien*, 127 Mo. 477, 488, 489. See also *Ex parte Van Sandau*, 1 Phillips 604, 606, 607; *People v. Bennett*, 4 Paige 282; *In re Blair*, 4 Wis. 521; *Sherwood v. Sherwood*, 32 Conn. 1.

Assuming, however, that the language used can be held to be an averment of a conviction or judgment of guilty of the offense there stated, such offense so recited is, so far as the petitioner is concerned, a constructive and not a direct contempt. The recital is that "Walter G. Smith was guilty of a contempt of this court by *publishing and printing*" a certain statement and cartoon, "which said * * * statement and * * * cartoon was *circulated and published* in the court room in the court house in Honolulu during the trial * * *" This is not a statement that the matter was circulated and published in the court room or caused to be so circulated and published *by Smith;* it is not a recital of a conviction of Smith for contempt by "publishing and printing" and by "circulating and publishing in the court room." In my opinion, as stated above, the printing and publication generally away from the court room may have been by Smith and the circulation and publication in the court room may have been by others for whose acts Smith would not be criminally responsible.

It may be remarked in this connection that it is not to be presumed that the court or the clerk issuing the mittimus intended or attempted to make therein an untrue or incorrect recital as to what the conviction or judgment was; and if it had been intended or attempted to state in the mittimus that the petitioner had been convicted or adjudged guilty of circulating and publishing *in the court room*, such statement would have been untrue and incorrect. After the introduction of the evidence, Circuit Judge Humphreys (the three judges of the Cir-

cuit Court sat together during the proceedings, but in what capacity or whether legally or otherwise I need not say) delivered the opinion of the judges or of the court and in concluding said: "It is the unanimous opinion of the judges of this court that the defendant should be held guilty *as charged in the complaint* herein." Following him Judge Gear, presiding at the term, said: "The judges have unanimously decided that this matter published has constituted a contempt of court *as charged in the complaint or affidavit* and I therefore find and adjudge you guilty of contempt of court *as alleged and set out in the affidavit on file* and ask you now if you have any reason to offer why sentence should not be passed upon you.    *    *    * And I will state now that the court has considered with both the other judges and come to the conclusion as to a proper sentence to be pronounced, having taken that into consideration in extenuation of the offense, and it is therefore the judgment of this court that you be and you are hereby adjudged guilty of contempt of court *as set forth in the affidavit*, and you are sentenced to imprisonment in Oahu Jail for the period of thirty days without hard labor." Clearly the adjudication of guilt was of the offense charged in the affidavit and that, as already stated, was a constructive contempt only and not a circulation or publication *in the court room*.

Going still further, and assuming that the paragraph of the mittimus in question is a recital of a conviction of Smith of a contempt by printing and publishing and by circulating and publishing *in the court room*, and assuming that such finding of the court below cannot be disturbed on *habeas corpus* even though there be no evidence to support it, I am of the opinion that the sentence and mittimus are invalid because the court had no jurisdiction to impose the one or issue the other in the absence of a conviction or judgment of guilty of that offense (this, of course, in view of my conclusion, to be hereafter stated, that the Circuit Courts of this Territory have no authority to punish for constructive contempts.) The authorities above cited sufficiently cover this point. The principle is the same where

the conviction is of an offense which the court has no jurisdiction to punish and the sentence and mittimus are for another and different offense, as where there is no conviction or judgment at all.

Has the Circuit Court of the First Circuit power to punish for constructive contempts? Under this head several questions have been presented and argued.

In August, 1888, the legislature of the monarchy passed an act (Chap. 42, Laws of 1888), the second section of which reads as follows: "Constructive contempts shall not hereafter be punishable as such." This language, taken by itself, is plain,—so plain as to leave no room for construction. It is contended, however, that read in connection with the two other sections of the statute, and in view of the causes that led to its enactment it must be construed to refer to such only of constructive contempts as are mentioned in section 1. The latter section reads: "The publication of proceedings before any court or judge shall not be deemed to be contempt, nor shall such publication be punishable as contempt"; and section 3: "The terms of this act shall apply to the publication of all proceedings in all courts, or before all judges, hitherto had, now pending or which may hereafter be brought." In my opinion, sections 1 and 3 do not contain sufficient to justify the limitation sought to be placed upon the plain language of section 2. If the words "constructive contempts" used in section 2 were intended to refer solely to the "publication of proceedings" mentioned in section 1, then section 2 is pure repetition and wholly superfluous. Section 1 of itself provides that such publication shall not be deemed to be contempt and further that such publication shall not be punishable as contempt. Under the circumstances, the presumption, if any, is that the legislature did not repeat unnecessarily and that it intended to include in section 2 something not already included in section 1. The presumption is further that the legislature in using the word "constructive" knew the distinction between constructive and direct contempts. The purpose of section 3 evidently was to provide that the proceedings permitted by the act,

to wit, by section 1, to be published, included *all* proceedings, in whatever court and at whatever times had.

In enacting this statute the legislature doubtless had in mind certain cases then recently decided by the Supreme Court but it is a mistake to suppose that those decisions were simply to the effect that the publication of proceedings was a constructive contempt and punishable as such. Such indeed was the ruling in *Smith v. Aholo, supra,* decided in April, 1887; but in *Ackerman v. Congdon, supra,* decided in January, 1887, the publication held to be a constructive contempt was, not of proceedings, but of newspaper comments or expressions which were deemed to be such as tended to influence the result of a pending suit. The same is true of the publication, held to be contempt, in *King v. Lee Fook,* 7 Haw. 249, (decided at the February Term, 1888, just before the legislature convened). It was not of proceedings but of matter tending to prejudice the right of the defendant to a fair and impartial trial. So far as history is concerned, then, there is good reason for believing that the legislature meant what it said, i. e., to prohibit thereafter the punishment as such of constructive contempts (which means any or all constructive contempts) and not merely of some constructive contempts.

In the case entitled *In re Bush,* 8 Haw. 221, the court construed the statute differently, holding that by "constructive" contempts the legislature meant those only which were not enumerated in section 257 of the Penal Laws. With respect, it seems to me that there is no sufficient ground for so construing the statute. It is contended that this court must now follow that decision because of the rule that where a statute, which has received a judicial construction, is re-enacted in the same or substantially the same terms, that is to be deemed a legislative adoption of such construction. The re-enactment here referred to is that contained in the Organic Act. The question is one as to the intention of Congress in passing the Organic Act, and this intention is to be ascertained from a reading of the Act as a whole. Section 6 provides, "that the laws of Hawaii not incon-

sistent with the Constitution or laws of the United States or the provisions of this Act shall *continue in force*, subject to repeal," etc. "Continue in force" means, "be of the same force," not more and not less, after as before the time stated. Section 81 provides that "until the legislature shall otherwise provide, the laws of Hawaii heretofore in force concerning the several courts and their jurisdiction and procedure shall continue in force except as herein otherwise provided." Before the Organic Act went into effect the Supreme Court had jurisdiction and authority to overrule any of its former decisions, with possibly some exceptions, real or apparent but not here material, and the act of 1888 was open to construction by the court and subject to having any former construction modified if to the court it should seem right and just to do so. In my opinion, Congress intended by the Organic Act to continue the same powers in this court in this respect which it theretofore had and the rule of construction contended for does not apply in this case. In so far, then, as the court in the Bush case held to the contrary on the subject of the construction of the Act of 1888, it should be overruled.

It is also contended that section 257 of the Penal Laws, which defines certain acts to be contempts, sets forth in the enumeration certain constructive contempts, that therefore if section 2 of the Act of 1888 is construed to include constructive contempts other than the publication of proceedings, that act would by implication repeal section 257 in part, and that repeals by implication are not favored. It is true that repeals by implication are not favored, but nevertheless there may be such repeals and they are to be given effect where the language and intent are clear.

The argument that the restriction contained in the Act of 1888 does not apply to the Circuit Court of the First Circuit because said court was not then in existence, is not sound. The provision clearly is sufficiently broad to apply to courts thereafter created as well as to courts then in existence. "The mere fact that the statute existed before that court was created does

not exclude it. The legislature made use of general language for the purpose, as it would seem, of applying the act not only to existing courts but to any that might thereafter be created."— *Middlebrook v. State*, 43 Conn. 267.

Was the Act of 1888 unconstitutional? The constitution in force at the time of its enactment was that of 1887, Article 64 of which was as follows: "The Judicial Power of the Kingdom shall be vested in one Supreme Court, and in such inferior courts as the legislature may from time to time, establish." Article 66 reads: "The Judicial Power shall be divided among the Supreme Court and the several inferior courts of the Kingdom, in such manner as the legislature may, from time to time, prescribe, and the terms of office in the inferior courts of the Kingdom shall be such as may be defined by the law creating them." The Circuit Court of the First Circuit was created by the legislature under that provision of the constitution. It was, under the Monarchy and the Republic, a legislative as distinguished from a constitutional court, and it was competent for the legislature which created it to define or limit its powers in the matter of contempts. "The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power. But the power has been limited and defined by the act of Congress of March 2d, 1831. The act, in terms, applies to all courts; whether it can be held to limit the authority of the Supreme Court, which derives its existence and powers from the Constitution, may perhaps be a matter of doubt. But that it applies to the Circuit and District Courts there can be no question. These courts were created by act of Congress. Their powers and duties depend upon the act calling them into existence, or subsequent acts extending or limiting their jurisdiction. The act of 1831 is, therefore, to them the law specifying

the cases in which summary punishment for contempts may be inflicted. It limits the power of these courts in this respect to three classes of cases: 1st, where there has been misbehavior of a person in the presence of the courts, or so near thereto as to obstruct the administration of justice; 2d, where there has been misbehavior of any officer of the courts in his official transactions; and 3d, where there has been disobedience or resistance by any officer, party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of the courts. As thus seen the power of these courts in the punishments of contempts can only be exercised to insure order and decorum in their presence, to secure faithfulness on the part of their officers in their official transactions, and to enforce obedience to their lawful orders, judgments, and processes."—*Ex parte Robinson*, 19 Wall. 505, 510, 511. See also *Ex parte Buskirk*, 72 Fed. 19; *Ex parte Poulson*, Fed. Cs. No. 11,350; *State v. Kaiser*, 20 Or. 57. Whether or not the Act of 1888 applied at the time of its enactment or applies now to the Supreme Court, is another question. Even if it did not so apply, still it was constitutional as to the inferior courts. See *Robertson v. Pratt*, 13 Haw. 590.

The Act of 1888, being valid at the time of its enactment and in force at the date of the Organic Act, was continued in force by section 6 of the latter act.

It is contended that the Organic Act is the Constitution of this Territory, that, since in section 81 it is provided "that the judicial power of the Territory shall be vested in one supreme court, circuit courts, and in such inferior courts as the legislature may from time to time establish," the Circuit Court of the First Circuit is a constitutional court, and that therefore its power to punish for contempt can not be limited. If, however, we are to regard the Organic Act as our constitution and as the instrument by which the Circuit Court was created, then it is also true that the limitation of authority was by the same instrument and by the same power which created the Circuit Court. Surely the power, whether it be the people directly or Congress, which grants a constitution and thereby creates a

court, may also define or limit the powers of that court. It may even legislate it out of existence.

My conclusion is that section 2 of the Act of 1888, in its application to the Circuit Court of the First Circuit is constitutional, valid and in force. Nor is the restriction thereby placed upon that court a novel one. The citations already made disclose some instances of similar limitations elsewhere; for other instances, see Laws of Pa., Duplicate, 1835, 1836, p. 793; Throop's Ann. Code of Civ. Pro. (N. Y.), §8, p. 6; *Galland v. Galland*, 44 Cal. 475, 478. "The force of public opinion in this country, in favor of the freedom of the press, has restrained the free exercise of the power to punish this class of contempts" (constructive), "and in many jurisdictions statutes have been enacted depriving the courts of the power to punish them."— Rapalje, Contempts, §56.

In my opinion, the sentence and commitment, if for a constructive contempt, are illegal and invalid for lack of jurisdiction on the part of the court to punish for such contempts, and, if for a direct contempt, are illegal and invalid for lack of jurisdiction on the part of the court to impose such sentence or order such commitment, no judgment of guilty of such offense having been rendered. The petitioner should be discharged.